**Opinion filed March 9, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-21-00046-CR

_____

## TOMMY DOYLE CHAMBLISS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 32nd District Court**
**Nolan County, Texas**
**Trial Court Cause Nos. 13039, 13354, 13355, & 13356**

## M E M O R A N D U M   O P I N I O N

In a single trial, the jury convicted Tommy Doyle Chambliss on four charges of indecency with a child by exposure. *See* TEX. PENAL CODE ANN. § 21.11(a)(2)(B) (West 2019). The indictments alleged that Appellant committed the same act on different dates—that with the intent to arouse or gratify his sexual desire, he intentionally or knowingly caused "PGG," a child younger than seventeen years of age, to expose her genitals. The indictments alleged the following dates:

trial court cause no. 13039 – November 13, 2019;

> trial court cause no. 13354 – January 1, 2019;
> trial court cause no. 13355 – January 1, 2018; and
> trial court cause no. 13356 – September 1, 2018.

The grand jury returned the indictment in trial court cause no. 13039 on December 17, 2019. The grand jury returned the indictments in trial court cause nos. 13354, 13355, and 13356 on August 18, 2020.

In both trial court cause nos. 13039 and 13354, the jury assessed Appellant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of five years and a fine of $5,000. The trial court ordered that Appellant's sentences for these two cause numbers run consecutively, with Appellant's sentence in cause no. 13354 beginning when Appellant has completed his sentence, or has been released on parole, in trial court cause no. 13039.

In both trial court cause nos. 13355 and 13356, the jury assessed Appellant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of two years and a fine of $5,000. The trial court ordered that the sentence in trial court cause no. 13355 runs concurrently with the sentence in trial court cause no. 13356 and that they begin when Appellant has either completed the sentences or been released on parole in trial court cause nos. 13039 and 13354. However, the trial court also suspended the sentences of confinement in trial court cause nos. 13355 and 13356 and placed Appellant on community supervision for a term of five years.

Appellant filed notices of appeal in trial court causes nos. 13039, 13354, 13355, and 13356, and those cases were docketed as separate appeals in this court. We subsequently granted Appellant's motion to consolidate the four appeals into a single cause number: No. 11-21-00046-CR. Appellant challenges his convictions in five issues. We affirm in part and reverse and render in part.

*Background Facts*

Appellant was a teacher at the Blackwell Consolidated Independent School District. He taught physical education and computers to elementary students. He also drove a school bus for the school district. At the time of trial, PGG was a nine-year-old third grader at Blackwell CISD. Appellant was her teacher for physical education and computers. PGG was eight years old in December 2019, when officers interviewed Appellant based on reports they had received.

In her trial testimony, PGG did not testify that she exposed her genitals to Appellant. When asked at trial if Appellant had ever made her feel uncomfortable, PGG described a single incident where Appellant took her out of a game of dodgeball. Also, during her first interview at the West Texas Child Advocacy Center, PGG did not make an outcry of exposure. Furthermore, PGG did not make an outcry during an examination performed by a forensic nurse examiner. However, PGG made an outcry during a second interview at the child advocacy center after officers interviewed Appellant. The second interview occurred approximately fifteen months prior to trial.

Brian Davis, an investigator with the Nolan County Sheriff's Department, and DPS Special Agent Anthony Bennett conducted a three-hour recorded interview of Appellant in December 2019, the entirety of which was shown to the jury. During the interview, Appellant described four incidents wherein PGG exposed either an injury or birthmark, either on or near her genitals, to him. April Songer, the forensic nurse examiner that examined PGG, testified that PGG has a dime-size birthmark on her right, inner thigh that is two inches from her anogenital area/labia majora.

In his recorded interview, Appellant described the four instances as follows:

- The first incident, occurring "about a year ago," involved PGG showing Appellant an "injury" that kept her from being able to run in P.E. She asked Appellant if he wanted to see the injury, to which he replied "sure," at which time she pulled down the front of her pants and

"exposed herself" to Appellant. Appellant later clarified during the interview that it was a scratch on one side of PGG's vaginal area and that "[he] saw enough of it to know what [he] was looking at."

- The second time was a couple of weeks later, when PGG wanted to show him that she still had "that hurt place" and pulled her shorts up to show him. Appellant stated that he observed that the place had healed and scarred over.

- The third time was within a month of the interview, when PGG repeatedly asked Appellant to show her "place" to him, to which he agreed, and PGG then pulled her pants down to show him.

- The fourth time was similar to the third time, with PGG asking to show Appellant her "place," and Appellant saying "okay." Appellant stated that this fourth occasion was like the others, in that he saw half of PGG's vaginal area.

In sequential order, the first incident would be the subject of trial court cause no. 13355; the second incident would be the subject of trial court cause no. 13356; the third incident would be the subject of trial court cause no. 13354; and the fourth incident would be the subject of trial court cause no. 13039.

In his recorded interview, Appellant stated that on each occasion, PGG exposed the lip of her vaginal area on one side and that he saw a portion of PGG's skin "past the crease mark" of her thigh. He stated that her underwear was "sideways" and that she did not "fully expose" herself, but that you could "kinda see the V part of her leg." Appellant estimated that PGG's birthmark is about an inch down her leg. When asked about the length of time that PGG "exposed herself" to Appellant, he estimated the time to be never more than one to five seconds. When asked if PGG showed him underwear or skin, Appellant stated, "Oh, it was skin," indicating that it was in the vaginal area and that he saw one side of her vaginal area. He further indicated that when the first incident occurred, the injury that PGG showed him was on her vaginal area. On three occasions, PGG pulled her pants down, and on the other occasion, PGG pulled a leg of her shorts up. And as indicated

4

above, Appellant said that on the last two occasions, PGG asked him if she could show her place to him, to which he agreed. Appellant stated in the interview that he did not report any of these four instances to his superiors at the school.

These four occurrences were not the only matters involving PGG that Appellant addressed in the recorded interview. PGG also rode the school bus that Appellant drove. He stated that PGG pulled down her pants and exposed her "frontal parts" to his grandson who also rode the bus.[1] The bus incident occurred prior to the four instances described above. Appellant immediately reported this bus incident to his supervisor at the school, who instructed Appellant to tell PGG's parents about the incident. Appellant told PGG's parents about the bus incident when he dropped off PGG from the bus.

At the conclusion of the interview, Appellant wrote a letter that stated as follows:

> I have always tried to be a good person and will continue to improve myself. I have seen things that I did not originally think I was going to see. I have taken steps to try to protect myself from being in that position. I am extremely sorry that I have allowed [PGG] to expose herself to me on multiple occasions and wish that I had properly reported it in the first instance. My concern is that she can overcome anything through counsel [sic] that I have done to effect [sic] her life. Likewise I have ask [sic] my Buffalo Gap church to pray for me and the situation, and would hope that I could be afforded counseling through this also. For all of my trustees I sincerely apologize for putting you in a position to have to go through any of this and would hope you find it in your heart to forgive and pray for me. I sincerely hope I am afforded to continue to help support my family and others in any way possible. I want to thank Brian and Anthony for hearing my side of all of the details. I just ask that anyone who reads this will always pray for me and that I am never in this position again. For the parents I am truly sorry I did

---

[1] E.J.W., a thirteen-year-old eighth grader, gave a different description of the bus incident. She testified that she observed the incident from the back of the bus and that it appeared to her that PGG pulled down her pants exposing herself to Appellant rather than Appellant's grandson.

not immediately tell you what [PPG] had done and would ask for forgiveness and only wish the best for you and your kid.

Sincerely, Tommy Chambliss

P.S. Also I would ask Mr. Gott to allow me to retire as I think it is best that I not go back to these kids and find a different career.

After Appellant gave the recorded interview, PGG was reinterviewed at the child advocacy center by Jennifer Nichols-Cunningham. Nichols-Cunningham testified that, during the second interview, PGG told her that on multiple occasions, Appellant asked PGG if she had a hurt place or a birthmark and if he could see it. PGG told Nichols-Cunningham that the place was a birthmark on her thigh and that she showed it to Appellant multiple times.

Appellant testified during the guilt/innocence phase. On direct examination, Appellant denied ever looking at PGG or any kid "in a sexual way" and testified that he had "never been sexually gratified or sexually aroused by any kid, ever." Appellant's trial counsel asked Appellant about a portion of his recorded interview, including reading from a transcription of the interview to Appellant and asking him about his interview responses. This questioning focused on a response that Appellant gave at the end of the recorded interview about why he asked to see girls' panties. During the interview, Appellant agreed with Agent Bennett that he asked to look at girls' panties for his gratification, rather than for the gratification of the girls. Agent Bennett specifically referenced PGG during this portion of the interview. At trial, Appellant testified that he was tired at the time that he gave this response and that he believed that Agent Bennett was talking about something else. Appellant ended his direct examination by agreeing with his trial counsel that he "never received any sexual gratification from any of the events depicted in this case."

During cross-examination, the prosecutor also asked Appellant about portions of his recorded interview. When asked about the instances he described in the recorded interview involving PGG, Appellant testified that he did not know "for

6

sure" that PGG showed him her vaginal area. Appellant stated that they were "almost saw" situations and that he "[i]mmediately . . . closed [his] eyes and looked away and did not see anything." Appellant also testified that he felt that Agent Bennett "led" him during the recorded interview to say that he saw PGG's vaginal area. Specifically, the prosecutor asked Appellant about his statement in the recorded interview that he saw PGG's vaginal "lips," to which Appellant replied that Agent Bennett "led me to trying to say that's what it was." He later testified that if "any part of [PGG's] vulva area was exposed, I didn't acknowledge or see that[,] nor was I ever sexually gratified by that[,] nor was I ever sexually aroused by that." Appellant also clarified that in his answer to the gratification question, he thought Agent Bennett was asking if he thought it looked like to others that his actions were gratifying to him and that his response was that it was a possibility that others would view it that way.

<em>Analysis</em>

<em>Sufficiency of the Evidence</em>

In his first four issues, Appellant challenges the sufficiency of the evidence supporting his four convictions. Appellant's four issues challenge the sufficiency of the evidence supporting his four convictions as follows:

> Issue One – trial court cause no. 13039;
> Issue Two – trial court cause no. 13354;
> Issue Three – trial court cause no. 13355; and
> Issue Four – trial court cause no. 13356.

Appellant primarily bases his evidentiary challenge on his assertion that the evidence was insufficient to establish that PGG ever exposed her genitals to anyone other than her mother and her doctor. Appellant also contends that PGG did not make an outcry of abuse or provide trial testimony to that effect, that her birthmark is not on her genitals, and that Appellant's statements were "incoherent" and not corroborated as required by the corpus delicti rule.

7

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all of the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight witness testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

A jury is prohibited from drawing conclusions based on speculation. *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)). "Speculation is mere theorizing or guessing about the possible meaning of the facts and evidence presented." *Id.* (quoting *Hooper*, 214 S.W.3d at 16). Conversely, "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id.* "Juries are permitted to draw multiple reasonable inferences from the evidence

as long as each inference is supported by the evidence presented at trial[.]" *Id.* (citing *Hooper*, 214 S.W.3d at 15).

We measure sufficiency of the evidence by the elements of the offense as defined in a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

A person commits the offense of indecency with a child by exposure if, "with intent to arouse or gratify the sexual desire of any person," the person "causes the child to expose the child's anus or any part of the child's genitals." PENAL § 21.11(a)(2)(B). Because the Penal Code does not define the term "genitals," and because it has not acquired a special legal or technical meaning, it is to be interpreted by the jury according to common usage and parlance. *Davisonhicks v. State*, No. 07-18-00021-CR, 2019 WL 1890898, at *3 (Tex. App.—Amarillo Apr. 26, 2019, pet. ref'd) (mem. op., not designated for publication); *see Green v. State*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015) (citing *Kirsch v. State*, 357 S.W.3d 645, 652 (Tex. Crim. App. 2012)).

The gravamen of the offense of indecency with a child by exposure is the nature of the prohibited conduct, and the allowable unit of prosecution is each exposure. *Loving v. State*, 401 S.W.3d 642, 648–49 (Tex. Crim. App. 2013). The Penal Code also does not define the term "expose." In *Moncada v. State*, we addressed the meaning of "exposure" under Section 21.11(a)(2)(B) for the purpose of reviewing the sufficiency of the evidence. *Moncada v. State*, No. 11-18-00236-CR, 2020 WL 6195176, at *2–3 (Tex. App.—Eastland Oct. 22, 2020, no pet.) (mem. op., not designated for publication). We noted that, because the term is not defined

by statute, we examine it consistently with its generally understood meaning. *Id.* at *2. We then cited *Balfour v. State* for the proposition that "[a]s far as the indecency with a child by exposure statute is concerned, exposure means: 'To deprive of concealment; to disclose or unmask something criminal, shameful, or the like.'" *Id.* (quoting *Balfour v. State*, 993 S.W.2d 765, 769 (Tex. App.—Austin 1999, pet. ref'd), which quotes *Miller v. State*, 243 S.W.2d 175, 176 (Tex. Crim. App. 1951)). We determined that when a defendant causes the exposure of a child's genitals, "[i]t is not necessary that anyone see the exposed genitals, it is enough that they were exposed." *Id.* at *3.

Appellant contends that we should "reevaluate" the interpretation we made in *Moncada* because it could lead to absurd results.[2] We decline to do so in this case because the facts here would not lead to an absurd result. We based our determination in *Moncada* on other cases that examined the meaning of "exposure." *Id.* at *2–3. Furthermore, at least one other court of appeals has interpreted "exposure" in the same way with respect to indecency with a child when a defendant is alleged to have caused the child's exposure. *See Mauro v. State*, 221 S.W.3d 896, 900–01 (Tex. App.—Beaumont 2007, no pet.) (determining that exposure can occur without proof of exposure to one's eyesight).

*The Corpus Delicti Rule*

In order to determine if Appellant's recorded interview may be considered in our review of the sufficiency of the evidence, we must initially address Appellant's contention that his interview had to be corroborated under the corpus delicti rule. The Texas Court of Criminal Appeals recently addressed the corpus delicti rule in

---

[2]The example given by Appellant of an absurd result would be an adult telling a child to go into a restroom and use it with the door closed—with the adult doing so for the purpose of sexual gratification. That example materially differs from the facts in this case because Appellant was in the same room with PGG during each of the four exposures.

*Shumway v. State*, No. PD-0108-20, 2022 WL 301737, at \*5 (Tex. Crim. App. Feb. 2, 2022), *cert. denied*, 143 S. Ct. 214 (2022).[3]  As noted in *Shumway*,

> The *corpus delicti* rule is a judicial rule of evidentiary sufficiency "affecting cases in which there is an extrajudicial confession."  It requires that, "[w]hen a conviction is based on a defendant's extrajudicial confession, that confession does not constitute legally sufficient evidence of guilt without corroborating evidence independent of that confession showing that the essential nature of the offense was committed."  The *corpus delicti* rule essentially adds an additional requirement to our traditional *Jackson v. Virginia* legal sufficiency analysis for cases involving extrajudicial confessions.
>
> Under the *corpus delicti* rule, the corroborating evidence does not need to independently prove the crime, but must simply make the occurrence of the crime more probable than it would be without the evidence.  Courts have traditionally applied the *corpus delicti* rule to ensure that a person is not convicted "solely on his own false confession to a crime that never occurred."  The rule has been applied in Texas for at least one hundred sixty years and originated over three hundred years ago in England.  It first developed in reaction to a slew of cases in which defendants admitted to the "murder" of missing persons, were executed, and, naturally, were not around for exoneration when their "victims" later turned up, much more alive than their self-admitted "murderers."
>
> The *corpus delicti* of a particular crime is simply "the fact that the crime in question has been committed by someone."  It does not require proof that the specific defendant committed the criminal act, just that the crime itself occurred.

2022 WL 301737, at \*5 (footnotes omitted).  The corpus delicti rule applies to extrajudicial confessions.[4]  *Id.* at \*6.  "[A]n in-court 'judicial' confession need not

_____

[3]The parties did not have the benefit of the opinion in *Shumway* when this case was briefed.

[4]It is somewhat dubious to treat Appellant's recorded interview as an extrajudicial confession.  The audio of Appellant's statements, as well as those of the two officers that questioned him, were recorded, along with the video depicting Appellant during the interview, the entirety of which was played to the jury.  Both Appellant's trial counsel and the prosecutor questioned Appellant extensively at trial about the contents of his recorded interview.  And in addressing the recorded interview at trial, Appellant testified that "[i]t's not [the officer's] fault that I said anything.  I'm accountable for anything that I say."

be corroborated." *Salazar v. State*, 86 S.W.3d 640, 645 n.18 (Tex. Crim. App. 2002). Furthermore, a defendant's in-court testimony can serve to corroborate his extrajudicial confession. *Id.* at 645.

*Shumway* involved a prosecution for indecency with a child by contact where the victim was a preverbal seventeen-month-old child. 2022 WL 301737, at *1. The defendant confessed to his pastor and his wife that he pushed aside the infant's diaper and touched her genital region with his hands, mouth, and penis.[5] *Id.* The court noted that the corpus delicti of indecency with a child by contact is the occurrence of a sexual touching of the child with the intent to arouse or gratify the sexual desire of a person. *Id.* at *5.

Here, the corpus delicti of indecency with a child by exposure is the exposure of the child's genitals to a person with the intent to arouse or gratify the sexual desire of a person. *See* PENAL § 21.11(a)(2)(B). Appellant asserts that there was no evidence outside of his recorded interview that corroborated the commission of the charged offenses.

In order to assess the sufficiency of the corroborating evidence for the purpose of the corpus delicti rule, we consider all of the admitted evidence except the extrajudicial confession, and we view it in the light most favorable to the verdict. *Miranda v. State*, 620 S.W.3d 923, 928–29 (Tex. Crim. App. 2021) (citing *Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993)). However, the extrajudicial confession can be used to help analyze the other available evidence with respect to the corpus delicti rule. *Shumway*, 2022 WL 301737, at *6.

Nichols-Cunningham testified as an outcry witness. Outcry witness testimony is substantive evidence of guilt for the purpose of a sufficiency review, and it is alone sufficient to support a conviction without corroboration by either the victim or

---

[5]The court in *Shumway* recognized a "narrow exception" to a strict application of the corpus delicti rule for instances when the confessed conduct is committed against a child incapable of outcry and the confessed conduct did not result in any perceptible harm. 2022 WL 301737, at *6.

independent evidence.  *Rodriguez v. State*, 819 S.W.2d 871, 873–74 (Tex. Crim. App. 1991); *see Villalon v. State*, 791 S.W.2d 130, 132–33 (Tex. Crim. App. 1990). Nichols-Cunningham testified as follows:

> Q.   What did [PGG] say [Appellant] would say to her that was concerning to you?
>
> A.   That he would ask -- he asked her if she had a hurt place or a birthmark and if he could see it at any time.
>
> Q.   And how did she say that she responded to that?
>
> A.   She said sure.
>
> Q.   Okay.  Did she then describe doing just that with [Appellant] on multiple occasions?
>
> A.   Yes.

Additionally, Songer testified about the close proximity of PGG's birthmark to her genitals.

Finally, we have Appellant's trial testimony to consider for corroboration purposes.  Appellant testified at trial about the four times that PGG showed him an injury or birthmark either on her genitals or near the area of her vagina/vulva.  With respect to the first occasion, Appellant testified that PGG told him that "she fell on the concrete at her house naked and skinned her private area."  He also testified that PGG "constantly" kept asking to show him "her area."  Appellant stated that the first two times were to show him the injury and the last two times were to show him her birthmark.  Appellant further testified that on the third occasion, he told PGG "[g]o ahead" when she asked to show him her birthmark.  He also told her on this occasion that "[t]his will be our secret."  Also, Appellant testified that a video of the fourth incident was accidently recorded on his phone but that he deleted it prior to his interview with the detectives.

These pieces of evidence were sufficient to satisfy the corpus delicti rule because they showed that the "essential nature" of the crime was committed, and

13

they made the occurrence of the crime more probable than it would be without the evidence. *See Shumway*, 2022 WL 301737, at *7; *Miranda*, 620 S.W.3d at 928. Accordingly, we may consider Appellant's recorded interview in assessing the sufficiency of the evidence supporting his convictions.

*Exposure of Genitals*

"The general requirements for an offense to have been committed are an actus reus and a mens rea." *Ramirez-Memije v. State*, 444 S.W.3d 624, 627–28 (Tex. Crim. App. 2014). Appellant contends that PGG's exposure of her genitals was the actus reus of indecency with a child by exposure. This assertion is technically incorrect. The actus reus of an offense is the defendant voluntarily engaging in the act resulting in criminal responsibility. *Id.* (citing PENAL § 6.01 (West 2021). Thus, the actus reus of indecency with a child by exposure would be Appellant causing the exposure. *See* PENAL § 21.11(a)(2)(B). However, the exposure of PGG's genitals was still a required element of the offense of indecency of a child by exposure as charged.[6]

As noted previously, the Penal Code does not define "genitals." Thus, the jury was permitted to use the common meaning of the term to assess Appellant's guilt. In his recorded interview, Appellant repeatedly stated that PGG *exposed* her *genitals* to him as those terms are commonly understood. He indicated that on the first occasion, the injury was on PGG's vaginal area and that she "exposed herself" to him. He further indicated that the four occasions involved the showing of "skin" of one side of her vaginal area, rather than underwear, and that it was past the crease or "V" mark of her leg.

Under our determination in *Moncada* of the meaning of exposure, Appellant's trial testimony that he looked away each time is of no consequence. *See Moncada*,

---

[6]As a required element of the charged offenses, the exposure of PGG's genitals was a *sine qua non* of the offenses. *See Otto v. State*, 273 S.W.3d 165, 175 (Tex. Crim. App. 2008) (Cochran, J., dissenting) ("The term *sine qua non* literally means 'without which not.'").

14

2020 WL 6195176, at \*3. PGG exposed her genitals because that portion of her body was deprived of concealment, disclosed, or unmasked. *See id.* at \*2–3; *see also Balfour*, 993 S.W.2d at 769. It was not necessary that Appellant actually saw the exposed genitals, it is enough that they were exposed. *See Moncada*, 2020 WL 6195176, at \*3. Moreover, the jury was free to disregard Appellant's self-serving testimony that he looked away each time.

Many of Appellant's contentions about the lack of evidence of exposure are based on inconsistencies in the evidence. For example, PGG did not testify at trial about any incidents of exposure, and during her first interview with Nichols-Cunningham, she stated that only her mother and doctor had seen her injury or birthmark. Conversely, during his recorded interview, Appellant provided details about the four incidents of exposure, and he addressed the exposure of PGG's genitals. Additionally, Appellant's trial testimony countered the lack of testimony from PGG about the four incidents. Under the applicable standard of review, we presume that the jury resolved inconsistencies in the evidence in favor of its verdict, and we defer to the determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. We conclude that the evidence of exposure was sufficient. In reaching this conclusion, we reject Appellant's contention that the evidence of exposure was simply too weak to reach this conclusion.

*Actus Reus*

Appellant directs little attention on the causative element—that he caused PGG to expose her genitals to him. *See* PENAL § 21.11(a)(2)(B). Nichols-Cunningham's testimony addressed the actus reus element because she testified about multiple instances of Appellant causing PGG to expose herself to him. However, she did not provide any testimony about any particular incidents. Nor did PGG. Appellant also addressed the actus reus of the offenses in a collective sense

when he stated in his apology letter, "I am extremely sorry that I have allowed [PGG] to expose herself to me on multiple occasions."

The only details of the specific occurrences came from Appellant—both in his trial testimony and the recorded interview. Contrary to Nichols-Cunningham's testimony, Appellant testified that he did not ask PGG to show him her injury or birthmark. Instead, Appellant testified that PGG "constantly" asked to show him her injury or birthmark.

Appellant testified that he was shocked on the first occasion, because he thought PGG was going to show him a skinned knee. Appellant testified that the second occasion happened "very quick," to the point that PGG exposed herself before he was able to tell her anything in response to her inquiry about wanting to show it to him. Appellant testified that on the third occasion, PGG had gotten to the point of being annoying in asking to show him, so he said, "Go ahead." Appellant described the fourth occasion to be like the third occasion, with PGG asking Appellant to show her place to him, to which Appellant agreed.

We first address the third and fourth occasions because Appellant's descriptions of those incidents differ in a material respect. These subsequent occasions are the subject of trial court cause nos. 13039 and 13354. Unlike the first two occasions, where Appellant stated that he was either surprised by what PGG showed him or did not have time to react, Appellant admitted that he knew what area of her body that PGG was going to show him. Appellant essentially asserted that his young student wore him down by being so persistent to the point that he capitulated to her requests to show him a place very near her genitals that, by his admissions in his recorded interview, resulted in the exposure of her genitals. Even if one accepts Appellant's version of the third and fourth incidents, the evidence is sufficient to support the actus reus for the third and fourth offenses because

16

Appellant caused these exposures by agreeing to PGG's purported requests to show him a place on her body that, in turn, caused the exposure of her genitals.

As noted previously, the only details of the specific incidents are derived from Appellant's interview with law enforcement and his trial testimony. Unlike with the subsequent instances, on the first occurrence, the subject of trial court cause no. 13355, Appellant stated that he did not know what PGG was going to show him when she asked to show him her injury. As such, there is no evidence to support Appellant's conviction for the first instance because there is no evidence that he caused the exposure with the requisite intent. Consequently, the State did not prove Appellant's guilt beyond a reasonable doubt. To find otherwise would constitute the drawing of a conclusion based upon speculation about the details of the first instance—a conclusion that is contrary to the only evidence that was presented at trial. *See Anderson,* 416 S.W.3d at 888; *Hooper*, 214 S.W.3d at 15–16. Accordingly, we sustain Appellant's third issue challenging his conviction in trial court cause no. 13355.

The second occurrence, the subject of trial court cause no. 13356, is more difficult to assess because Appellant had knowledge of what PGG was going to show him as a result of the first instance. However, the only evidence about this occasion is Appellant's statement that he did not have time to respond before the exposure occurred. As such, evidence that he caused the exposure on the second occasion is not present. Therefore, and similar to the offense charged in trial court cause no. 13355, the State did not prove Appellant's guilt beyond a reasonable doubt. Accordingly, we sustain Appellant's fourth issue challenging his conviction in trial court cause no. 13356.

*Mens Rea*

With respect to evidence of the requisite mental state, direct evidence of what an accused intended at the time he committed the offense is rare. *See Moore v. State,*

17

969 S.W.2d 4, 10 (Tex. Crim. App. 1998) ("Mental states are almost always inferred from acts and words."). With respect to a defendant's intent to arouse or gratify his sexual desire, his intent can be inferred from the act itself. *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981).

The record is replete with Appellant's denials that he ever looked at a child, including PGG, in "a sexual way" and with his statements that he had "never been sexually gratified or sexually aroused by any kid, ever." Conversely, the officers conducting Appellant's recorded interview inquired into Appellant's fascination with girls' and women's panties. Appellant stated that he was fascinated by the design of panties, but not in a sexual way. But Appellant also indicated that he was possibly fascinated by the body areas that are covered by panties. Additionally, we have already addressed Appellant's response during the recorded interview that seeing panties would be for his gratification.

There are additional matters that bear on Appellant's mens rea during the four exposures by PGG. Even though he was PGG's elementary school teacher, Appellant indicated in his recorded interview and his apology letter that he did not report these four exposures to his supervisors at the school. This nondisclosure differs from the prior incident on the bus when Appellant immediately reported the incident. Additionally, Appellant also told PGG after the third occasion that "this will be our secret." Finally, the fourth occasion was recorded on Appellant's phone, but he deleted the recording. These efforts to conceal the occurrences, coupled with his fascination with panties, is evidence supporting an inference that he possessed an intent to arouse or gratify his sexual desire when he caused PGG's exposure. As such, the evidence was sufficient for the jury to determine beyond a reasonable doubt that Appellant possessed the requisite intent on the third and fourth occasions. We overrule Appellant's first and second issues.

18

*Written Report of CPS Investigator*

In his fifth issue, Appellant challenges the admission of a written report prepared by a CPS investigator, Tammy Allred, wherein she found "reason to believe" that Appellant was responsible for sexual abuse occurring with PGG, along with other girls. Allred described the document as a "closure letter" sent to the alleged perpetrator as well as others affected by the CPS investigation. The closure letter included the following definition: "'Reason to Believe' means that a preponderance of the evidence supports that the alleged abuse or neglect did occurr." The prosecutor sought to admit the letter after Allred had previously testified that, based upon her investigation, she had concerns that Appellant's conduct had caused harm to the mental, emotional, and physical welfare of the children.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). We also uphold a trial court's evidentiary ruling if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.).

At trial, Appellant's trial counsel objected to the admission of the closure letter on the basis that "it relates to a civil investigation. It is not part of the criminal case and could tend to confuse the jury as to the relevant issues concerning the criminal case, and that's my objection." In making the objection, Appellant's trial counsel noted that his objection was the same as his objection that he made to Allred's oral testimony wherein he objected to Allred's finding of "reason to believe" on the bases that it was "made by a special agency under different standards

19

of the law," "is irrelevant in this proceeding," and "could confuse the issues." The trial court overruled Appellant's objections.

On appeal, Appellant presents several arguments for the exclusion of the closure letter, some of which were not preserved for appellate review. Appellant contends that the closure letter was inadmissible hearsay, that its probative value was substantially outweighed by its confusion of the issues in violation of Rule 403 of the Texas Rules of Evidence, and that it contains "propensity and character conformity evidence" in violation of Rule 404(b). *See* TEX. R. EVID. 403, 404(b). Because Appellant did not object at trial on the grounds that the closure letter constituted hearsay or that it violated Rule 404(b), those arguments are not preserved for appellate review.

As the losing party, Appellant was required to alert the trial court to all of the grounds upon which he relies to assert that the trial court should have excluded the closure letter. *See Klein v. State*, 273 S.W.3d 297, 312 (Tex. Crim. App. 2008); *Gutierrez v. State*, 630 S.W.3d 270, 281 (Tex. App.—Eastland 2020, pet. ref'd). As noted by the Court of Criminal Appeals:

> [T]he party complaining on appeal (whether it be the State or the defendant) about a trial court's admission, exclusion, or suppression of evidence must, at the earliest opportunity, have done everything necessary to bring to the judge's attention the evidence rule or statute in question and its precise and proper application to the evidence in question. The issue . . . is not . . . whether the trial court's ruling is legally correct in every sense, but whether the complaining party on appeal brought to the trial court's attention the very complaint that party is now making on appeal.

*Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005) (internal quotation marks omitted) (footnote omitted); *see Golliday v. State*, 560 S.W.3d 664, 669 (Tex. Crim. App. 2018) (quoting *Reyna*); *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009) ("[I]n order to preserve a complaint for appeal, the complaining

party must have done everything necessary to bring the relevant evidentiary rule and its precise and proper application to the trial court's attention.") (citing *Reyna*).

Appellant objected at trial to Allred's findings on the bases that they were irrelevant and that they could confuse the jury. Rule 401 provides that evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action." TEX. R. EVID. 401. Relevant evidence is generally admissible, whereas "[i]rrelevant evidence is not admissible." TEX. R. EVID. 402.

Under Rule 403, relevant evidence may be excluded if its "probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury." TEX. R. EVID. 403. Appellant did not cite Rule 403 to the trial court as a basis for excluding Allred's "reason to believe" finding. However, he did state that the evidence would confuse the jury. "Confusion of the issues" refers to a tendency to confuse or distract the jury from the main issues in the case, and "misleading the jury" refers to a tendency of an item of evidence to be given undue weight by the jury. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006) (citing S. Goode, et al., *Texas Practice: Guide to the Texas Rules of Evidence* § 403.2 at 164–65 (3rd ed. 2002)).

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002) (citing *Montgomery v. State*, 810 S.W.2d 372, 376 (Tex. Crim. App. 1990)); *see Martin v. State*, 570 S.W.3d 426, 437 (Tex. App.—Eastland 2019, pet. ref'd). When we review a trial court's determination under Rule 403, we reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery*, 810 S.W.2d at 392).

An analysis under Rule 403 includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012); *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006); *Martin*, 570 S.W.3d at 437. Rule 403, however, does not require that the balancing test be performed on the record. *Martin*, 570 S.W.3d at 437 (citing *Greene v. State*, 287 S.W.3d 277, 284 (Tex. App.—Eastland 2009, pet. ref'd)). "By its express terms, evidence is not excludable under Rule 403 for merely being prejudicial—the rule applies to evidence that is *unfairly* prejudicial." *Id.* "Evidence is unfairly prejudicial when it has an undue tendency to suggest an improper basis for reaching a decision." *Id.* (citing *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000); *Render v. State*, 347 S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd)).

As recently noted by the Fort Worth Court of Appeals, "[c]aselaw supports the proposition that a CPS worker can testify that CPS found 'reason to believe' [that abuse occurred]." *Taylor v. State*, No. 02-16-00299-CR, 2017 WL 5894923, at *3 (Tex. App.—Fort Worth Nov. 30, 2017, pet. ref'd) (mem. op., not designated for publication)[7]; *see Johnson v. State*, 970 S.W.2d 716, 720 (Tex. App.—Beaumont 1998, no pet.) (stating that it was not error to admit testimony of CPS investigator that CPS found reason to believe); *see also Wagner v. State*, No. 14-07-00906-CR, 2009 WL 838187, at *8 (Tex. App.—Houston [14th Dist.] Mar. 31, 2009, pet. ref'd) (mem. op., not designated for publication) (noting that "reason to believe" evidence could assist the trier of fact); *Bowers v. State*, No. 2-02-250-CR, 2003

---

[7]As noted in *Taylor*, "reason to believe" is one of five possible dispositions that CPS may make after investigating allegations of child abuse or neglect. 2017 WL 5894923, at *3 n.3.

WL 22026428, at *6 (Tex. App.—Fort Worth Aug. 29, 2003, pet. ref'd) (stating not error to admit testimony of CPS investigator that CPS found reason to believe).

We have also reached the same conclusion on at least two occasions. *See Castro v. State*, No. 11-14-00095-CR, 2017 WL 922505, at *4–5 (Tex. App.—Eastland Feb. 28, 2017, no pet.) (mem. op., not designated for publication); *Harrell v. State*, No. 11-03-00092-CR, 2005 WL 1405729, at *3 (Tex. App.—Eastland, June 16, 2005, no pet.) (not designated for publication). The defendant in *Castro* objected to the admission of a CPS finding of "reason to believe" on essentially the same basis at issue here—that the CPS investigator used a lower, different standard of proof and as a result, the jury would be confused and unable to consider the evidence in the proper context. 2017 WL 922505, at *4. We determined in *Castro* that the trial court did not abuse its discretion by overruling the defendant's objection on these grounds, relying on the precedent permitting its admission. *Id.* at 5.

We reach the same conclusion in this case. We are primarily guided by the fact that the different standard of proof utilized by the CPS investigator could be understood by a rational jury. In this regard, the prosecutor established that Allred used a different standard. Additionally, Appellant's trial counsel extensively questioned Allred about the different standard during cross-examination. Allred answered in the affirmative to counsel's question that her findings would be irrelevant in a criminal case. Accordingly, the trial court did not abuse its discretion by overruling Appellant's objection to the closure letter.

Even if the trial court had erred in admitting the closure letter, the error was harmless. Generally, an error in the admission of evidence over a Rule 403 objection is nonconstitutional. *Perez v. State*, 562 S.W.3d 676, 691 (Tex. App.—Ft. Worth 2018, pet. ref'd). Nonconstitutional error is subject to a harmless error analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure, which examines

23

whether the defendant's substantial rights were affected. *Davison v. State*, 405 S.W.3d 682, 688 (Tex. Crim. App. 2013). A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). One's substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

The admission of the closure letter did not affect Appellant's substantial rights because of the reason that we have already stated—both the attorneys and Allred explained that she used a different standard for her finding of "reason to believe." This explanation ameliorated the harm, if any, of misleading the jury by its admission. Accordingly, we overrule Appellant's fifth issue.

*This Court's Ruling*

We reverse the judgments of conviction in trial court cause nos. 13355 and 13356, and we render a judgment of acquittal in both of those causes. We affirm the judgments in trial court cause nos. 13039 and 13354.

JOHN M. BAILEY
CHIEF JUSTICE

March 9, 2023

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.